| | |
|---|---|
| Blaise S. Curet (SBN 124983)<br>Melissa A. Dubbs (SBN 163650)<br>SINNOTT, PUEBLA, CAMPAGNE & CURET,<br>APLC<br>2000 Powell Street, Suite 830<br>Emeryville, California 94608<br>Telephone:    (415) 352-6200<br>Facsimile:    (415) 352-6224<br>Email:    bcuret@spcclaw.com<br>mdubbs@spcclaw.com | Harris B. Winsberg (admitted *pro hac vice*)<br>Matthew M. Weiss (admitted *pro hac vice*)<br>Matthew G. Roberts (admitted *pro hac vice*)<br>PARKER, HUDSON, RAINER & DOBBS LLP<br>303 Peachtree St NE, Suite 3600<br>Atlanta, Georgia 30308<br>Telephone:    (404) 523-5300<br>Facsimile:    (404) 522-8409<br>Email: hwinsberg@phrd.com<br>mweiss@phrd.com; mroberts@phrd.com |
| Robin D. Craig (SBN 130935)<br>LAW OFFICE OF ROBIN CRAIG<br>6114 La Salle Avenue, No. 517<br>Oakland, CA 94611<br>Telephone:    (510) 549-3330<br>Email:    rdc@rcraiglaw.com | Todd C. Jacobs (admitted pro hac vice)<br>John E. Bucheit (admitted pro hac vice)<br>PARKER, HUDSON, RAINER & DOBBS LLP<br>Two N. Riverside Plaza, Suite 1850<br>Chicago, Illinois 60606<br>Telephone:    (312) 477-3305<br>Email: tjacobs@phrd.com; jbucheit@phrd.com |

*Attorneys for Westport Insurance Corporation f/k/a Employers Reinsurance Corporation*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| *In Re:*<br><br>THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,<br><br>Debtor and Debtor in Possession<br>_____<br>WESTPORT INSURANCE CORPORATION, FORMERLY KNOWN AS EMPLOYERS REINSURANCE CORPORATION,<br>Plaintiff<br><br>v.<br><br>THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, a corporation sole, and DOES 1 through 50;<br><br>Defendants. | Case No. 23-30564<br><br>Chapter 11<br><br>Hon. Dennis Montali<br><br>**WESTPORT INSURANCE CORPORATION'S COMPLAINT FOR DECLARATORY JUDGMENT AND DEMAND FOR JURY TRIAL**<br><br>ADVERSARY Case No. |

Plaintiff Westport Insurance Corporation ("Westport") formerly known as Employers

Reinsurance Corporation ("ERC") brings this Complaint for Declaratory Relief in its favor and

against Defendant, The Roman Catholic Archbishop of San Francisco ("RCASF" or the

"Archdiocese"), and in support of the Complaint alleges as follows[1]:

## NATURE OF THE ACTION

1. The RCASF filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code on August 21, 2023 (the "Petition Date"). This Bankruptcy Case is pending before the Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"). [Main Case, ECF No. 1].

2. The United States Trustee for Region 17 appointed the Committee on September 1, 2023, pursuant to 11 U.S.C. § 1102. [Main Case, ECF No. 58].

3. In October 2019, Governor Gavin Newsom signed AB 218, known as the California Child Victims Act (the "CVA"), which amended California Code of Civil Procedure § 340.1. The CVA created a "lookback window" that allowed victims of childhood sexual assault to revive previously time-barred civil claims. This "lookback window" provided a three-year period, from 2020 to 2022, for survivors to file lawsuits regardless of when the abuse occurred.

4. During the CVA's "lookback window," approximately 541 Claimants filed civil actions (the "Underlying Claims") against the RCASF, virtually all of which have been consolidated (along with other Northern California clergy cases naming other defendants) into a coordinated proceeding entitled *In re Northern California Clergy Cases*, Judicial Council Coordination Proceeding ("JCCP") No. 5108 in the Superior Court of California, County of Alameda.

5. Specifically, the Claimants allege that for decades the Archdiocese permitted, denied and concealed the sexual abuse by priests and others employed by the RCASF. The suits also allege that this abuse was the expected result of a culture that reached the highest levels of the Catholic Church, including the Vatican, which allowed childhood sexual abuse committed by priests and others to thrive.

6. The Claimants also allege that the Archdiocese shuffled abusers from parish to parish and Archdiocese to Archdiocese to keep secret the scandal. This alleged pattern is consistent with a nationwide pattern that has emerged in the Catholic Church as a whole and its Archdioceses and

---

[1] Westport alleges on personal knowledge as to allegations about itself. As to allegations about any other parties, Westport alleges on information and belief.

parishes throughout the United States as well as around the world. Grand juries, convened across this country, have published reports detailing the culture of abuse permeating the Catholic Church. In the past two decades alone, California, New York, New Hampshire, Massachusetts, Pennsylvania, Maine, Missouri and Colorado have all convened grand juries to investigate allegations of sexual abuse in the Catholic Church. Each has published reports detailing similar tactics utilized to keep secret this insidious criminal behavior. These findings paint a pervasive, deep picture of a systemic culture of abuse and concealment.

7. The RCASF, together with affiliated parishes and schools under its control (sometimes referred to simply as "affiliates"), have now tendered and seek coverage from Westport for more than 100 of the Underlying Claims that the RCASF asserts fall within the ERC excess insurance policy it issued to the RCASF in the 1970s.

8. Westport contends that the policies it issued do not afford coverage to RCASF for the more than 100 Underlying Claims that RCASF has tendered to Westport, including, but not limited to:

    a. That Westport has no duty to afford coverage for Underlying Claims that arise from allegations of abuse by Father Joseph Pritchard or, at a minimum, that Westport has no duty to afford coverage to the RCASF for Underlying Claims that arise from allegations of abuse by Father Joseph Pritchard after December 31, 1973 based on a 2005 jury verdict, which found that "the Archbishop of San Francisco, by December 31, 1973, kn[e]w or ha[d] reason to know, or was . . . otherwise on notice, that Father Joseph Pritchard had committed unlawful sexual conduct;"

    b. That settlements in 2005 between the RCASF and Westport in the Clergy III cases, JCCP No. 4359, bar coverage under the ERC excess policy for at least four claims brought by one of more of the Claimants;

    c. That one or more of the Underlying Claims were not caused by an occurrence that resulted in personal injury during the policy period that was neither expected nor intended from the standpoint of RCASF;

    d. That one or more of the Underlying Claims allege personal injury outside the ERC excess policy period;

1      e.  That the limits of liability of the policies underlying the ERC excess policy have not

2          been exhausted either through adjudication or compromise with ERC's written

3          consent.

4      f.  That RCASF has not complied with the terms and conditions of the ERC excess

5          policy.

6   9.  There now exists an actual, justiciable controversy between Westport and the Archdiocese

7   concerning coverage under the ERC excess policy issued to RCASF. Westport seeks a declaration

8   that it has no obligation to afford coverage under the ERC excess insurance policy for the more

9   than 100 Underlying Claims tendered to it, or any other similar sexual abuse or molestation claims

10  against the RCASF or any of its affiliates that claim insured status under ERC's excess policy for

11  the reasons stated above.

12                                    **JURISDICTION AND VENUE**

13  10. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157

14  and 1334.

15  11. This adversary proceeding is a non-core proceeding. Plaintiff does not consent to entry of a

16  final order or judgment by the Bankruptcy Court in this matter.

17  12. The Debtor's Chapter 11 Case No. 23-30564 is currently pending in the United States

18  Bankruptcy Court for the Northern District of California.

19  13. Venue is proper in this district under 28 U.S.C. § 1409(a) because the bankruptcy case is

20  pending in this district.

21  14. The requested relief is proper under 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act)

22  because there now exists an actual, justiciable controversy between Westport and the Archdiocese.

23                                    **THE PARTIES**

24  15. Plaintiff Westport is a corporation organized under the laws of the state of Missouri with its

25  principal place of business in Kansas City, Missouri, and is licensed to operate in the State of

26  California. Effective January 1, 2008, Westport merged with and into Employers Reinsurance

27  Company (ERC) and then changed its name to Westport Insurance Corporation.

28  16. Defendant The Roman Catholic Archbishop of San Francisco is a corporation sole

established by the Vatican in or about 1853, with its principal place of business in San Francisco, California. The Archdiocese of San Francisco is made up of three counties: San Francisco County, Marin County, and San Mateo County. The Archdiocese of San Francisco controls and operates approximately 88 parishes, 120 schools, and one seminary. The Archdiocese of San Francisco included The Roman Catholic Bishop of Oakland until its separation in or about January 13, 1962, The Roman Catholic Bishop of Santa Rosa until its separation in or about January 13, 1962, and The Roman Catholic Bishop of San Jose until its separation in or about 1981.

17. Westport is ignorant of the true names and capacities of each of the defendants designated in this complaint as Does 1-50. Westport is informed and believes and, on that basis, alleges that each of the defendants sued as Does 1-50 is in some manner interested in the controversy alleged in this complaint. Upon learning the true name and capacity of each of the Doe defendants, the Insurers will amend this complaint accordingly.

18. Westport is informed and believes and thereon alleges that at all times relevant hereto each of the defendants, including without limitation Does 1-50, was the agent, affiliate, officer, director, manager, principal, alter-ego or employee of the other defendants and was at all times acting within the scope of such agency, affiliation, alter-ego relationship or employment and actively participated in, or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged herein, with full knowledge of all the facts and circumstances.

## FACTUAL ALLEGATIONS

### A. *The ERC Insurance Policy*

19. Westport's predecessor, ERC, issued policy number U10447 for the period July 8, 1972 to July 8, 1975 to the RCASF, herein sometimes referred to as the "The ERC excess policy."

20. The ERC excess policy provides coverage pursuant to the terms, definitions, conditions, limitations, exclusions, and endorsements contained within that policy.

21. The ERC excess policy affords coverage pursuant to its terms in excess of scheduled underlying insurance with limits of liability of $1 million each occurrence and in the aggregate.

22. As an excess insurer, Westport has no immediate potential coverage obligation unless and until the applicable underlying insurance has been exhausted either through adjudication or

compromise with ERC's written consent. To date, there has been no indication or notice that the limits underlying the ERC excess policy have been exhausted in accordance with the terms of the policies, and therefore Westport has no immediate potential coverage obligations.

23. Specifically, the ERC excess policy provides, in part, as follows:

SECTION

COVERAGE. The Corporation hereby agrees to indemnity the Insured against such ultimate net loss in excess of the Insured's primary limit as the Insured sustains by reason of liability, imposed upon the Insured by law or assumed by the Insured under contract, for damages because of personal injury or property damage to which this policy applies, caused by an occurrence anywhere in the world.

SECTION II

DEFENSE, If no other insurer has the right and duty to do so, the Corporation shall have the right and duty to defend any suit against the Insured seeking damages on account of such personal Injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, but the Corporation shall not be obligated to defend any suit after the Corporation's liability has been exhausted; Provided that:

(a) In connection with the aforesaid right and duty to defend, the Corporation may make such Investigation and settlement of any claim or suit as it deems expedient, including payment on behalf of the Insured of part or all of the Insured's primary limit. In the event of such payment of part or all of the Insured's primer)· limit, the Insured shall promptly reimburse the Corporation therefor upon notice of the action taken,

(b) If the Corporation is prevented by law or otherwise from defending the Insured as aforesaid, the Corporation will reimburse the Insured for defense costs and expenses incurred with the written consent of the Corporation.

(c) Amounts incurred by the Corporation In connection with the defense of the Insured as aforesaid, except settlements of claims and suits, are payable by the Corporation in addition to the Corporation's limit of liability.

* * * *

SECTION IV

INSURED'S PRIMARY LIMIT, The Insured's primary limit with respect to each occurrence shall be an amount of ultimate net loss equal to:

(a) In respect of damages covered by the underlying insurance listed in Item 4 of the Declarations, the sum of (1) the amount of the applicable limits of such insurance, and (2) the amount recoverable by the Insured under any other insurance available to the Insured; and

(b) in respect of damages not covered by the underlying insurance listed in Item 4 of the Declarations, the greater of (1) the amount recoverable by the Insured under any other insurance available to the Insured, or (2) the amount stated in Item 5 of the Declarations.

The limits stated in Item 4 of the Declarations for the underlying insurance listed therein shall not be considered applicable to the extent of any aggregate limit reduction or depletion by virtue of the payment of loss in respect of personal injury or property damage which occurs during the period of this policy.

The underlying insurance listed in Item 4 of the Declarations shall be deemed to be effective to the full extent of the limits stated therein irrespective of whether

such underlying Insurance is in force when the occurrence takes place, irrespective of any defense which the underlying Insurer may assert because of failure to comply with any condition of its policy and irrespective of the inability of the underlying Insurer to pay by reason of bankruptcy or insolvency.

SECTION V

CORPORATION'S LIMIT OF LIABILITY. Regardless of the number of (a) Insureds under this policy, (b) persons or organizations who sustain injury or damage, (c) claims made or suits brought on account of personal injury or property damage, or (d) automobiles, aircraft or watercraft to which this policy applies; the limit of liability stated in Item 6 (a) of the Declarations is the limit of the Corporation's liability for all ultimate net loss as the result of any one occurrence.

There is no limit to the number of occurrences for which claims may be made, except that the limit of liability stated In Item 6 (b) of the Declarations is the total limit of the Corporation's liability for all ultimate net loss in 'respect of all personal injury and property damage which occurs during the policy period and arising out of the products hazard or the completed operations hazard or both combined. if this policy is issued for more than one year, this aggregate limit of liability applies separately to each consecutive annual period of this policy, or if the last consecutive period is less titan twelve months, to such period of less than twelve months.

SECTION VII

DEFINITIONS. When used in this policy (including endorsements forming a part hereof)

   (a) "*damages*" includes damages for death and for care and loss of services resulting from personal injury and damages for loss of use of property resulting from property damage;

          * * *

   (c) "*occurrence*" means an accident, including injurious exposure to conditions, which results, during the policy period, in personal injury or property damage neither expected nor intended from the standpoint of the insured. All personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence;

   (d) "*personal injury*" means bodily injury, mental injury, mental anguish, shock, sickness, disease, or disability; injury arising out of false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, racial or religious discrimination, humiliation, libel, slender, defamation of character, or invasion of rights of privacy, The term "personal injury" shall also include, when committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the Named insured's advertising activities, injury arising out of: (1) infringement of copyright or of title or of slogan, and (2) piracy or unfair competition or Idea misappropriation under an implied contract;

          * * *

   (f) "*ultimate net loss*" means the total sum which the Insured, or any company as his insurer, or both, become obligated to pay as damages because of personal injury or property damage, either through adjudication or compromise with the written consent of the Corporation,

    24. The ERC excess policy covers losses caused by an "occurrence," which means "an

accident, including injurious exposure to conditions, which results, during the policy period, in

personal injury or property damage *neither expected nor intended from the standpoint of the insured*. All personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

25. The ERC excess policy provides that the "[t]he Insured shall cooperate with the Corporation" in connection with the defense of the claim. It also provides that "[i]n the event of an occurrence, which in the judgment of the Insured is likely to involve the liability of the Corporation hereunder, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the Insured to the Corporation as soon as practicable. "

**B.** ***Information Regarding the Archdiocese's Prior Knowledge of Abusive Priests and Other Individuals and Widespread Coverup of Its Knowledge Of Abuse***

26. The complaints filed in the Underlying Claims allege knowing and intentional conduct and suggest that the Archdiocese had broad institutional awareness of the sexual abuse problem. This is consistent with allegations in similar lawsuits filed throughout the United States against other entities affiliated with the Catholic Church. This pattern of allegations lends credence to the allegations specific to the San Francisco Archdiocese. Nevertheless, Westport has not concluded that the allegations in specific Underlying Claims are valid or that any of the claims are meritorious. Westport continues to investigate each claim, including whether the allegations of injury caused by sexual abuse were neither expected nor intended from the standpoint of RCASF.

27. Although the RCASF has provided some information to Westport about certain Underlying Claims, that information is incomplete and insufficient. Consequently, Westport will seek discovery in this Complaint of information relevant to each claim that the RCASF has submitted to Westport. To the extent that specific information obtained in discovery does not support coverage as to a particular claim, Westport will ultimately seek coverage declarations based on that information, as to that claim.

28. Aside from the limited information provided by the Archdiocese, Westport has also obtained information about alleged sexual abuse within the Catholic Church, and within the

1  Archdiocese specifically, from publicly available sources. This information is relevant in

2  determining whether the ERC excess policy provides coverage for any of the Underlying Claims

3  that allegedly fall within the policy period.

4      29. Publicly available information suggests that the Church has historically promoted a culture

5  of secrecy intended to protect the Church from scandal. For example, authors Thomas P. Doyle, A.

6  W.R. Sipe, and Patrick J. Wall write in *Sex, Priests, and Secret Codes: The Catholic Church's*

7  *2,000-Year Paper Trail of Sexual Abuse* that all cardinals in the Catholic church (the group of

8  bishops who elect the Pope) must take an oath never to divulge information confided to them that

9  "might bring harm or dishonor to the Holy Church."

10      30. In addition, in *Kavanaugh v. Roman Catholic Archbishop of San Francisco*, San Francisco

11  County Superior Court, Case No. CGC-03-400003, Dennis Kavanaugh filed a civil lawsuit against

12  the RCASF alleging that the late Father Joseph Pritchard had molested him during the early 1970s,

13  while he was a student at St. Martin of Tours, where Pritchard had been assigned in 1971. The

14  Archdiocese did not dispute that Kavanaugh was abused. Rather, the sole question put before the

15  jury was whether Pritchard's superiors knew or should have known about the abuse. In answer to

16  this sole question, the jury determined that "the Archbishop of San Francisco, by December 31,

17  1973, kn[e]w or ha[d] reason to know, or was . . . otherwise on notice, that Father Joseph Pritchard

18  had committed unlawful sexual conduct." Yet Pritchard continued working at St. Martin of Tours

19  until 1979 and then was transferred to St. Nicholas Catholic School in Los Altos, Ca where he

20  continued working until 1988.

21      31. In addition, nearly two decades before Father Pritchard sexually abused Kavanaugh, in the

22  late 1950s, he allegedly sexually abused his own 10-year old nephew. At the time, Pritchard was

23  teaching at Junipero Serra High School in San Mateo, which was then a part of the Archdiocese.

24  The nephew's mother allegedly reported the abuse to the school in 1959 but was allegedly brushed

25  off.

26      32. In the Underlying Claims, the Claimants, who include victims of alleged abuse by

27  Pritchard, contend that the Church's policy of secrecy fostered an environment in which sexual

28  predation by clergy (and other Church representatives) was implicitly condoned and actively

1  covered up by Church officials.

2  33. The Underlying Claims assert that the Archdiocese or its affiliates knew about the sexual

3  abuse of minors. The Master Complaint for the Underlying Claims alleges:

4  
5  [T]he RELIGIOUS ENTITY DEFENDANTS, and each of them, knew or should
   have known that the DOE PERPETRATOR was unfit, posed a risk of harm to
   minor children, and/or posed a risk of childhood sexual assault to minor children
6  in its care, custody and control. Specifically, RELIGIOUS ENTITY
   DEFENDANTS knew or should have known, or were otherwise on notice, that
7  the DOE PERPETRATOR had engaged in misconduct that created the risk of
   childhood sexual assault and failed to take reasonable steps or to implement
8  reasonable safeguards to avoid acts of childhood sexual assault by the DOE
   PERPETRATOR on minors, including Plaintiff."

9  
10  (Master Complaint in JCCP 5108, ¶ 33.)

11  34. The Master Complaint further avers that the Archdiocese or its affiliates committed

12  intentional conduct by hiring, not supervising, or transferring to other posts clergy about whom

13  they had notice regarding abuse of the plaintiff or other victims. Specifically, the Master

14  Complaint contends:

15  Defendants also intentionally and willfully implemented various measures intended and
   designed to, or which effectively, made the DOE PERPETRATOR's conduct harder to
16  detect including, but not limited to:

17  a.  Assigning and permitting the DOE PERPETRATOR to remain in a position
       of authority and trust after DEFENDANT RELIGIOUS ENTITIES and
18       DOES 1through 500 knew or should have known that was an unfit agent,
       servant, employee, member and/or volunteer;

19  
20  b.  Assigning and permitting the DOE PERPETRATOR to remain in a position
       of authority and trust after DEFENDANT RELIGIOUS ENTITIES and
       DOES 1 through 500 knew or should have known that was in misconduct
21       that created a risk of childhood sexual assault to be perpetrated by the DOE
       PERPETRATOR;

22  
23  c.  Placing the DOE PERPETRATOR in a separate and secluded environment,
       including placing him in charge of children, which allowed the DOE
       PERPETRATOR to sexually and physically interact with and assault the
24       children, including Plaintiff;

25  d.  Authorizing the DOE PERPETRATOR to come into contact with minors,
       including Plaintiff, without adequate supervision;

26  
27  e.  Failing to inform, or concealing from Plaintiff's parents and law
       enforcement officials the fact that Plaintiff and others were or may have
       been sexually assaulted after Defendants knew or should have known that
       the DOE PERPETRATOR may have sexually assaulted Plaintiff or others,
28       thereby enabling Plaintiff to continue to be endangered and sexually

assaulted, and/or creating the circumstance where the Plaintiff and others were less likely to receive medical/mental health care and treatment, thus exacerbating the harm to Plaintiff;

f.    Holding out and affirming the DOE PERPETRATOR to Plaintiff and Plaintiffs parents, other children and their parents, and to the community as being in good standing and trustworthy;

g.    Failing to take reasonable steps, and to implement reasonable safeguards to avoid acts of unlawful sexual conduct by the DOE PERPETRATOR with students minor children; and

h.    Failing to put in place a system or procedure to supervise or monitor employees, volunteers, representatives or agents to insure that they did not molest or assault minors in Defendants' custody or care, including Plaintiff.

(Master Complaint in JCCP 5108, ¶ 36.)

35. The Underlying Claims further assert that the Archdiocese or its affiliates failed to stop the sexual abuse, covered it up, and then lied about it. The Master Complaint alleges that, "This failure was a part of Defendants' intended plan and arrangement to conceal wrongful acts, to avoid and inhibit detection, to block public disclosure, to avoid scandal, to avoid the disclosure of their tolerance of child sexual molestation and assault, to preserve a false appearance of propriety, and to avoid investigation and action by public authority including law enforcement." (Master Complaint in JCCP 5108, ¶ 39.) The Underlying Claims allege different legal theories, including intentional torts, strict liability, and negligence.

### *C. The Archdiocese Released Certain Claims In the 2005 Clergy III Settlement Agreement.*

36. Additionally, one of the claimant's to the Underlying Claims – identified in his Complaint as John SF-1 Doe, San Francisco County Superior Court Case No. CGC-20-584162 and on his Proof of Claim, filed in the Main Bankruptcy action as 564-383 – alleges that he was sexually molested by Fr. Joseph Pritchard between 1974 and 1977. This Claimant's two brothers previously alleged they were also molested by Fr. Pritchard.

37. The claims relating to the two brothers were resolved as part of a Confidential Settlement Agreement and Mutual Release ("Release") that was entered in July 2005 between the Archdiocese and its insurers, including Westport. Paragraph 3.02 of that Release provides that the Archdiocese releases all past, present and future actions, known or unknown, which relate in any

1  manner to the "Abuse Claims." Paragraph 4.01 of the Release provides that it was the intention of

2  the Parties that "the Insurers shall have no further financial obligation of any kind with respect to

3  the Abuse Claims.""

4  38. The term "Abuse Claims" is defined in Paragraph 1.12 of the Release to include:

> "Abuse Claims" means (1) the lawsuits identified in Rider A to this Agreement, and (2) any other claim asserted by or on behalf of the plaintiffs in the lawsuits identified in Rider A and/or any claim asserted by any person related to a plaintiff by birth, ... which claim arises out of or is based, directly or indirectly, upon actual or alleged acts of sexual abuse. . . and/or any other actual or alleged conduct constituting "childhood sexual abuse" for purposes of Cal. Civ. Proc. Code 340.1....

39. The lawsuit filed on behalf of the two brothers is listed on Rider A to the Release. Since Claimant John SF-1 Doe is a person related by birth to the two brothers, his claim was released by the RCASF in 2005. Moreover, Westport is informed and believes and thereon alleges that the Archdiocese was aware that John SF-1 Doe was also one of Fr. Pritchard's alleged victims at the time the Release was entered. Finally, inasmuch as a jury, in 2005, determined that the RCASF knew from at least December 31, 1973, that Pritchard sexually abused children, Westport has no potential payment obligations with respect to the claim of John SF-1 Doe, who alleges that the abuse started in 1974.

### D.  The Limits Of Liability In The Underlying Policy Have Not Been Exhausted So That Westport's Excess Coverage Is Not Implicated.

40. The Archdiocese now seeks coverage under the ERC excess policy for more than 100 of the Underlying Claims, including for John SF-1 Doe. However, because the ERC excess policy is an excess policy, Westport has no immediate potential coverage obligation unless and until the applicable underlying insurance is exhausted either through adjudication or compromise with ERC's written consent. To date, there has been no indication or notice that the limits underlying the ERC excess policy have been exhausted. Therefore, Westport has no immediate potential coverage obligations.

41. At no time prior to the issuance of the ERC excess policy did anyone acting on behalf of the Archdiocese advise Westport's predecessor, ERC, about the then-existing and known problem of sexual molestation by people in positions of power and authority within the Catholic Church.

1  Indeed, to this day, the Archdiocese has never provided Westport with a full accounting of the

2  problem and the extent of sexual abuse committed by Archdiocese employees and agents.

3

4  **FIRST CAUSE OF ACTION**
   **(DECLARATORY JUDGMENT - NO DUTY TO DEFEND OR INDEMNIFY**

5  **UNDERLYING CLAIMS ALLEGING ABUSE BY FATHER JOSEPH PRITCHARD)**

6  42. Plaintiff incorporates, restates, and re-alleges all of the preceding paragraphs as though

7  fully set forth herein.

8  43. Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and obligations of the

9  parties under the ERC excess insurance policy on the grounds that an actual controversy exists.

10  44. An actual and real controversy exists herein between Plaintiff and the RCASF whether

11  Westport has any obligation to defend and/or indemnify the Archdiocese for Underlying Claims

12  alleging abuse by Father Joseph Pritchard.

13  45.  Pritchard has been accused in the Underlying Claims of sexually abusing minors, and in

14  2003, his nephew filed suit against him, alleging childhood sexual abuse that allegedly began in

15  1957 or 1958 and allegedly ended in 1959, when his mother, Pritchard's sister, allegedly reported

16  him to school officials at Junipero Serra High School.

17  46.  The Archdiocese and/or its affiliates engaged in a pattern of continuously reassigning and

18  transferring Pritchard to different parishes despite knowledge that he was a pedophile.

19  47. The Archdiocese and/or its affiliates allowed and cultivated a culture of opportunity for

20  Pritchard to sexually abuse children.

21  48. The Archdiocese and/or its affiliates failed to investigate prior allegations of sexual abuse

22  of children by Pritchard and failed to report the abuse to the authorities.

23  49. It is alleged in the Underlying Claims that despite receiving credible allegations of sexual

24  abuse of children by Pritchard, the Archdiocese and/or the affiliates named in the Underlying

25  Claims alleging abuse by Father Pritchard, acted to conceal these allegations in an effort to avoid

26  scandal and accountability.

27  50.  Plaintiff has no obligation under the ERC excess policy to defend and/or indemnify the

28  Archdiocese and/or its affiliates for the Underlying Claims alleging abuse by Pritchard because it

is alleged that the abuse that is the subject of these suits was known by the Archdiocese and/or its affiliates to be certain or substantially certain to occur, and therefore the alleged injury from the abuse was either expected or intended from the standpoint of RCASF and was otherwise not fortuitous.

51. At a minimum, the 2005 jury verdict in the *Kavanaugh* matter, which found that "the Archbishop of San Francisco, by December 31, 1973, kn[e]w or ha[d] reason to know, or was . . . otherwise on notice, that Father Joseph Pritchard had committed unlawful sexual conduct", has a preclusive effect for any Underlying Claims brought against the RCASF that alleges abuse by Father Pritchard after December 31, 1973 because:

    a. The issue in this case is identical to the issue decided in the prior *Kavanaugh* matter.

    b. The issue was actually litigated in the *Kavanaugh* matter.

    c. The determination of the issue was a critical and necessary part of the judgment in the *Kavanaugh* case.

    d. The party against whom preclusion is asserted (*i.e.*, the RCASF) had a full and fair opportunity to litigate the issue in the *Kavanaugh* case.

Under 28 U.S.C.A. § 1738, federal courts must give the same preclusive effect to a state court judgment as it would receive in the courts of the state where the judgment was rendered. See, *In re Mickletz*, 544 B.R. 804 (2016).

52. Accordingly, Westport requests that this Court declare that Westport has no obligation under the ERC excess policy to defend and/or indemnify the RCASF and/or its affiliates for the Underlying Claims alleging abuse by Father Joseph Pritchard.

53. A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties as aforementioned. Said controversy is incapable of resolution without a judicial determination.

/ / /

/ / /

/ / /

Case No.
WESTPORT INSURANCE CORPORATION'S COMPLAINT FOR DECLARATORY JUDGMENT

**SECOND CAUSE OF ACTION**
**(DECLARATORY JUDGMENT - NO DUTY TO DEFEND OR INDEMNIFY UNDERLYING CLAIMS THAT WERE RELEASED BY THE 2005 SETTLEMENT)**

54. Plaintiff incorporates, restates, and re-alleges all of the preceding paragraphs as though fully set forth herein.

55. Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and obligations of the parties under the ERC excess insurance policy on the grounds that an actual controversy exists.

56. An actual and real controversy exists herein between Plaintiff and RCASF regarding the 2005 Release between RCASF and its insurers, including Westport. Paragraph 3.02 of that Release provides that the Archdiocese releases all past, present and future actions, known or unknown, which relate in any manner to the "Abuse Claims." Paragraph 4.01 of the Release provides that it was the intention of the Parties that "the Insurers shall have no further financial obligation of any kind with respect to the Abuse Claims."

57. The term "Abuse Claims" is defined in Paragraph 1.12 of the Release to include:

> "Abuse Claims" means (1) the lawsuits identified in Rider A to this Agreement, and (2) any other claim asserted by or on behalf of the plaintiffs in the lawsuits identified in Rider A and/or any claim asserted by any person related to a plaintiff by birth, ... which claim arises out of or is based, directly or indirectly, upon actual or alleged acts of sexual abuse. . . and/or any other actual or alleged conduct constituting "childhood sexual abuse" for purposes of Cal. Civ. Proc. Code 340.1....

58. Lawsuits that were filed on behalf of various claimants, which settled in 2005, are listed on Rider A to the Release. Westport is informed and believes and, on that basis, alleges that several claimants in the Underlying Claims, are related by birth to claimants that settled their claims in 2005, and on that basis, their claims were released by the RCASF. Hence, Plaintiff has no duty or obligation to defend and/or indemnify the RCASF for those Underlying Claims.

59. Finally, inasmuch as a jury, in 2005, determined that the RCASF knew from at least December 31, 1973, that Pritchard sexually abused children, Westport has no obligations under the ERC excess policy with respect to the claim of John SF-1 Doe, who alleges that Pritchard first began to abuse him in 1974.

60. Accordingly, Westport requests that this Court declare that it has no obligation under the ERC excess policy to defend and/or indemnify the RCASF and/or its affiliates for Underlying

Claims based on the 2005 Release.

61. A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties as aforementioned. Said controversy is incapable of resolution without a judicial determination.

### THIRD CAUSE OF ACTION
### (DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 – NO DUTY TO DEFEND OR INDEMNIFY – NO OCCURRENCE)

62. Plaintiff incorporates, restates, and re-alleges all of the preceding paragraphs as though fully set forth herein.

63. Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and obligations of the parties under the ERC excess insurance policy on the grounds that an actual controversy exists.

64. ERC issued the ERC excess policy listed above in paragraph 19 to the Archdiocese.

65. The ERC excess policy only covers injury to a third party, caused by an occurrence, defined as "an accident, including injurious exposure to conditions, which results, during the policy period, in personal injury or property damage *neither expected nor intended from the standpoint of the Insured*" and which occurred during the policy's stated "policy period." (emphasis added).

66. An actual and justiciable controversy exists among the parties. Westport desires a judicial determination of the respective rights and duties of the parties. Such declaration is necessary and proper at this time in order that the parties may ascertain their respective rights and duties.

67. The ERC excess policy affords coverage for liability imposed on the insured for damages because of injury to which the policy applies, caused by an "occurrence," which is an accident that results in injury during the policy period neither expected nor intended from the standpoint of the Archdiocese.

68. Publicly available information suggests that the injury caused by the sexual abuse alleged in the Underlying Claims was either expected or intended from the standpoint of the Archdiocese.

69. Because the Underlying Claims were not caused by an "occurrence" that resulted in personal injury or damage during the policy period that was neither expected nor intended from the

standpoint of the Archdiocese, there is no possibility of coverage for any of these claims under the ERC excess policy.

70. Accordingly, Westport requests that this Court declare that it has no obligation under the ERC excess policy to defend and/or indemnify the RCASF and/or its affiliates for the Underlying Claims.

71. A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties as aforementioned. Said controversy is incapable of resolution without a judicial determination.

**FOURTH CAUSE OF ACTION**
**(DECLARATORY JUDGMENT – NO DUTY TO DEFEND OR INDEMNIFY FOR ANY PERSONAL INJURY THAT OCCURRED OUTSIDE OF THE POLICY PERIOD)**

72. Plaintiff incorporates, restates, and re-alleges all of the preceding paragraphs as though fully set forth herein.

73. Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and obligations of the parties under the ERC excess insurance policy on the grounds that an actual controversy exists.

74. An actual and real controversy exists herein between Plaintiff and the RCASF whether Westport owes any duty or obligation to the RCASF for claims of sexual abuse that resulted in injury outside the ERC excess policy's stated policy period.

75. Westport seeks a declaration that it is has no obligation to afford coverage to the Archdiocese and/or any individual parishes or schools for any personal injury that occurred outside of the ERC excess policy's stated policy period, and that Westport is obligated-if at all-to provide coverage to the Archdiocese and/or its affiliates only for that portion of any bodily injury that occurred during the ERC excess policy's stated policy period.

76. A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties as aforementioned. Said controversy is incapable of resolution without a judicial determination.

/ / /

/ / /

**FIFTH CAUSE OF ACTION
(DECLARATORY JUDGMENT –NO EXHAUSTION OF PRIMARY LIMITS)**

77. Plaintiff incorporates, restates, and re-alleges all of the preceding paragraphs as though fully set forth herein.

78. Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and obligations of the parties under the ERC excess policy on the grounds that an actual controversy exists.

79. The RCASF has demanded that Westport defend and indemnify it under the ERC excess policy in connection with the Underlying Claims.

80. The ERC excess policy applies only to "ultimate net loss" in excess of the insured's primary limit, which is defined by the policy as the "total sum which the Insured, or any company as his Insurer, or both, become obligated to pay as damages because of personal injury or property damage, with through adjudication or compromise with the written consent of the Corporation [ERC.]"

81. Unless and until the primary limit is exhausted in accordance with the policy's terms, coverage under the ERC excess policy does not attach for any of the Underlying Claims.

82. Westport seeks a declaration regarding its rights and duties under the ERC excess policy concerning application of the foregoing provisions and attachment of coverage under the ERC excess policy.

83. A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties as aforementioned. Said controversy is incapable of resolution without a judicial determination.

**SIXTH CAUSE OF ACTION
(DECLARATORY JUDGMENT –BREACH OF THE POLICY'S TERMS AND
CONDITIONS)**

84. Plaintiff incorporates, restates, and re-alleges all of the preceding paragraphs as though fully set forth herein.

85. Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and obligations of the parties under the ERC excess insurance policy on the grounds that an actual controversy exists.

86. The RCASF has demanded that Westport defend and indemnify it under the ERC excess

policy in connection with the Underlying Claims.

87. An actual and real controversy exists herein between Plaintiff and the RCASF whether RCASF has breached any term or condition of the ERC excess policy and therefore, Westport has no obligation to defend or indemnify the RCASF, including without limitation:

    a.    to the extent that the RCASF has failed to provide timely notice of an occurrence, claim, or suit, as required under the ERC excess policy;

    b.    to the extent that the Underlying Claims do not involve bodily injury during ERC excess policy period;

    c.    to the extent that the remaining terms and conditions of the ERC excess policy bars coverage for the Underlying Claims;

    d.    to the extent that the RCASF has failed to cooperate with Westport.

88. Westport seeks a declaration regarding its rights and duties under the ERC excess policy concerning application of the foregoing provisions under the ERC excess policy.

89. A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties as aforementioned. Said controversy is incapable of resolution without a judicial determination.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Westport respectfully request that the Court enter judgment against the Archdiocese:

    a.    declaring that Westport has no obligation under the ERC excess policy to defend and/or indemnify the Archdiocese and/or its affiliates for the Underlying Claims alleging abuse by Father Joseph Pritchard;

    b.    declaring that Westport has no duty to afford under the ERC excess policy to defend or indemnify the Archdiocese for any Underlying Claims that were released by the 2005 Settlement;

    c.    declaring that Westport has no duty under the ERC excess policy to defend or indemnify the Archdiocese because the Underlying Claims were not caused by an

1  "occurrence" that resulted in personal injury during the policy period that was neither

2  "expected nor intended" from the standpoint of the Archdiocese;

3      d.  declaring that Westport only has an obligation to afford coverage to the Archdiocese

4  and its affiliates, if at all, under the ERC excess policy for that portion of any

5  Underlying Claim that alleges personal injury during the stated policy period and that it

6  has no obligation to afford coverage for any personal injury that occurred outside of the

7  ERC excess policy's stated policy period;

8      e.  declaring that unless and until the primary limit is exhausted in accordance with the

9  policy's terms, coverage under the ERC excess policy does not attach for any of the

10  Underlying Claims;

11      f.  declaring whether RCASF has breached any term or condition of the ERC excess

12  policy and therefore Westport has no obligation to defend or indemnify the RCASF;

13      g.  granting any other relief that the Court deems just and proper.

14

15  DATED: October 8, 2025               SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC

16

17  By: _____

18  Blaise S. Curet, (SBN 124983)
Melissa A. Dubbs (SBN 163650)

19  2000 Powell Street, Suite 830
Emeryville, California 94608

20  Tel: (415) 352-6200
Fax: (415) 352-6224

21  bcuret@spcclaw.com
mdubbs@spcclaw.com

22

23

24

25

26

27

28

-and-

PARKER, HUDSON, RAINER & DOBBS LLP

By:/s/ *Todd C. Jacobs*
Todd C. Jacobs (*pro hac vice*)
John E. Bucheit (*pro hac vice*)
Two N. Riverside Plaza, Suite 1850
Chicago, Illinois 60606

Harris B. Winsberg (*pro hac vice*)
Matthew M. Weiss (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
303 Peachtree St NE, Suite 3600
Atlanta, Georgia 30308

-and-

LAW OFFICE OF ROBIN CRAIG

By:/s/ *Robin D. Craig*
Robin D. Craig (SBN 130935)
6114 La Salle Avenue, No. 517
Oakland, CA 94611

1                                    **JURY DEMAND**

2 Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Westport hereby demands a jury trial on

3 all the issues so triable.

**SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC**
2000 POWELL STREET, SUITE 830
EMERYVILLE, CALIFORNIA 94608
TEL. (415) 352-6200 • FAX (415) 352-6224

1

## PROOF OF SERVICE

2

**STATE OF CALIFORNIA, COUNTY OF ALAMEDA**

3

    At the time of service, I was over 18 years of age and **not a party to this action**.  I

4

am employed in the County of Alameda, State of California.  My business address is 2000 Powell Street, Suite 830, Emeryville, CA 94608.

5

    On October 8, 2025, I served true copies of the following document(s) described as

6

**WESTPORT INSURANCE CORPORATION'S COMPLAINT FOR DECLARATORY JUDGMENT AND DEMAND FOR JURY TRIAL** on the interested

7

parties in this action.

8

    **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the

9

case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by

10

other means permitted by the court rules.

11

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

12

    Executed on October 8, 2025, at Emeryville, California.

13

14

               _M. Mejia_

Michelle Mejia

15

16

17

18

19

20

21

22

23

24

25

26

27

28